IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello

Civil Action No. 19-cv-03084-CMA-NRN

TERANCE D. WILSON,

    Plaintiff,

v.

TOLENTINO,
BIEREND,
PERDUE,
BRENDON R. MARKHAM,
LEWIS,
ROMERO,
JULIAN,
GONZALES, and
LOZANO,

    Defendants.

---

**ORDER AFFIRMING AND ADOPTING RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE**

---

This matter is before the Court on the April 9, 2020 Recommendation (Doc. # 46)

by Magistrate Judge N. Reid Neureiter, wherein he recommends that Defendants

Tolentino, Bierend, Perdue, Markham, Lewis, Romero, and Gonzales's[1] (collectively,

---

[1] The Court notes that the instant Motion was not filed on behalf of Defendants Julian and Lozano, and defense counsel indicates that those individuals "could not be identified as current or former employees with the CDOC." (Doc. # 29 at 1 n.1.) Upon review of the docket, those Defendants do not appear to have been served as of the date of this Order.

"Defendants") Motion to Dismiss (Doc. # 29) should be granted in part and denied in part. For the following reasons, the Court affirms the Recommendation.

## I. BACKGROUND

Judge Neureiter's Recommendation provides a recitation of the factual and procedural background of this dispute and is incorporated herein by reference. *See* 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b). Accordingly, this Order will reiterate only what is necessary to address Defendants' objections.

In many respects, this case represents another chapter in a chronicle of Plaintiff's tribulations in the penal system. The prologue of this story is set forth in an order issued by the Tenth Circuit in 2017:

> Mr. Wilson [Plaintiff], a former affiliate of the Crips, is currently serving a thirty-two-year prison sentence in connection with the 2011 homicide of Nathan Engle, a purported Surenos affiliate. While awaiting trial, Mr. Wilson was detained in the Larimer County Detention Facility ("Larimer") along with Christopher Green, whom Mr. Wilson recognized as a leader of the Surenos. Mr. Green allegedly told two people close to Mr. Wilson that the Surenos were making shanks in order to kill Mr. Wilson in apparent retaliation for Mr. Engle's death. And, indeed, Mr. Wilson reports that he was assaulted on three occasions while detained at Larimer—once on August 14, 2011, by Mr. Green and an unknown Sureno affiliate, and twice on October 21, 2011, first by an inmate named Charles Cousino, purportedly at Mr. Green's request, and later the same day by an inmate named Feliciano Carillo, whom Mr. Wilson describes as "a Sureno shot caller." Aplt. App'x 135–36. Mr. Wilson filed grievances with respect to each assault.

*Wilson v. Falk*, 877 F.3d 1204, 1207 (10th Cir. 2017). In *Falk*, Plaintiff alleged that he made prison officials aware of the danger he faced from the Surenos. However, he claimed that the officials disregarded his concerns, and ultimately, a member of the

Surenos "stabbed him eleven times, inflicting injuries to Mr. Wilson's heart, lungs, head, and neck." *Id.* at 1209.

The facts that form the basis of Plaintiff's Complaint in this case took place after Plaintiff was transferred to the Sterling Correctional Facility ("Sterling") in January 2019.[2] He alleges that, when he was transferred to Sterling, his reputation transferred with him. Specifically, Plaintiff asserts that "it soon became 'common knowledge' among inmates and authorities that 'Terance Wilson' had arrived and that he had been for 8 long years the top target of Surenos and 2-11 white inmates . . . ." (Doc. # 1 at 5.) In fact, "[u]pon arrival at Sterling [he] was informed by [Defendant] Tolentino on behalf of the inmates . . . that 'if [he] attempted to go to recreation, class, or table times, he would be fucked up,'" and after that, Plaintiff "was threatened[3] again . . . that 'he would be killed if [he] went to table time.'" (*Id.* at 6.) Thus, the stage was set for what Plaintiff calls a "campaign of harassment" against him, which was perpetrated by Sterling inmates and employees. (*Id.* at 5.)

Much of the allegedly wrongful conduct in the "campaign of harassment" involved, or was related to, efforts to inhibit Plaintiff's ability to use the telephone. According to Sterling policy, "staff are to facilitate distribution of the phone." (*Id.* at 6.) However, Defendants Romero and Lewis "allow the Surenos and 2-11s to handle [and] distribute [the telephone], and extort and oppress black inmates," and others.

---

[2] The following facts are derived from Plaintiff's Complaint (Doc. # 1) and are deemed true for purposes of this Order.

[3] Plaintiff indicates that he submitted grievances each time he was threatened.

On October 11, 2019, Plaintiff had a confrontation with Defendant Lewis. He claims that Defendant Lewis called him a "rat" for complaining to the "Shift Commander" about the problems he had gaining access to the phone.[4] (*Id.*) Other inmates overheard Defendant Lewis' comment, and Plaintiff asserts that Defendant Lewis must have known that calling him a "rat" would put Plaintiff in danger because he was already a target, and other inmates would accept Defendant Lewis' accusation without questioning it.[5]

Plaintiff further alleges that Defendants Gonzales and Lozano "harassed him for weeks . . . calling him a 'rat,' and denying [him] routine supplies because, '[he had] killed a Mexican, and they wouldn't do nothing [sic] for [him]." Additionally, Plaintiff asserts that Defendants Gonzales and Lozano followed directions from the Surenos to "distribute [his] mail to Hispanics, and [they] taunted 'now they got [sic] all of your information[,] what are you going to do?'" (*Id.*)

The "campaign of harassment" also included Sterling employees raising false accusations against Plaintiff. On August 29, 2019, Defendant Tolentino accused Plaintiff of stealing property from a Sureno gang member. Defendant Tolentino "announced to the pod that 'the nigger's a thief,' and [he] went to tell the Surenos [Plaintiff had] stolen [their property]." (*Id.* at 7.) The incident exacerbated the animosity that the Surenos

---

[4] In addition to Defendant Lewis, Plaintiff also claims that Defendants Julian, Tolentino, Perdue, and Markham wrongly denied him access to the telephone on at least one occasion. (Doc. # 1 at 7–8.)

[5] Plaintiff also alleges that Defendants Romero, Perdue, and Bierend told other inmates that Plaintiff was a "rat" or that he "narced" on them, which antagonized the inmates against Plaintiff. (Doc. # 1 at 6–8.)

displayed towards Plaintiff. Similarly, on October 13, 2019, Defendant Markham made a false report that Plaintiff threatened to harm him. As a result, Plaintiff was confined to the segregation unit.

Finally, Plaintiff asserts that he was subjected to physical intimidation and assault. Specifically, Defendants Tolentino and Perdue "came to shake [him] down for 'filing numerous complaints' [and] Tolentino began threatening him, and brushed by [his] face while [Defendant] Romero held [him] outside [his] cell, then pushed [him] up against the wall." (*Id.*) Additionally, Defendants Perdue and Markham "became hostile when taking [him] to the shower," and they left him in the shower for an hour before Defendant Markham "jammed the shower door against [his] back." (*Id.* at 8.)

Plaintiff's concern for his safety has allegedly had a negative impact on his mental health. He indicates that he informed Defendants Romero and Lewis, as well as the warden, that his condition was worsening, but no action was taken. He also alleges that the "campaign of harassment" began after he filed a legal complaint and submitted several grievances about his treatment.

Defendants filed a Motion to Dismiss on January 6, 2020, arguing that all of Plaintiff's claims should be dismissed. (Doc. # 29.) Judge Neureiter disagreed and recommended that the majority of Plaintiff's claims—with the exception of his claims for money damages against Defendants in their official capacities—should go forward. This Objection followed.

## II. LEGAL STANDARDS

### A. REVIEW OF A RECOMMENDATION

When a magistrate judge issues a recommendation on a dispositive matter, Federal Rule of Civil Procedure 72(b)(3) requires that the district judge "determine *de novo* any part of the magistrate judge's [recommended] disposition that has been properly objected to." An objection is properly made if it is both timely and specific. *United States v. One Parcel of Real Property Known As 2121 East 30th Street*, 73 F.3d 1057, 1059 (10th Cir. 1996). In conducting its review, "[t]he district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3).

In the absence of a timely objection, however, "the district court may review a magistrate [judge's] report under any standard it deems appropriate." *Summers v. Utah*, 927 F.2d 1165, 1167 (10th Cir. 1991) (citing *Thomas v. Arn*, 474 U.S. 140, 150 (1985) (stating that "[i]t does not appear that Congress intended to require district court review of a magistrate's factual or legal conclusions, under a de novo or any other standard, when neither party objects to those findings.")).

### B. *PRO SE* PLAINTIFF

Plaintiff proceeds *pro se*. The Court, therefore, reviews his pleading "liberally and hold[s] [it] to a less stringent standard than those drafted by attorneys." *Trackwell v. U.S.*, 472 F.3d 1242, 1243 (10th Cir. 2007) (citations omitted). However, a *pro se* litigant's "conclusory allegations without supporting factual averments are insufficient to

state a claim upon which relief can be based." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

A court may not assume that a plaintiff can prove facts that have not been alleged, or that a defendant has violated laws in ways that a plaintiff has not alleged. *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983); *see also Whitney v. New Mexico*, 113 F.3d 1170, 1173–74 (10th Cir. 1997) (a court may not "supply additional factual allegations to round out a plaintiff's complaint"); *Drake v. City of Fort Collins*, 927 F.2d 1156, 1159 (10th Cir. 1991) (a court may not "construct arguments or theories for the plaintiff in the absence of any discussion of those issues"). Nor does *pro se* status entitle a litigant to an application of different rules. *See Montoya v. Chao*, 296 F.3d 952, 957 (10th Cir. 2002).

## C.    FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)

Federal Rule of Civil Procedure 12(b)(6) provides that a defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations and quotation marks omitted).

"A court reviewing the sufficiency of a complaint presumes all of plaintiff's factual allegations are true and construes them in the light most favorable to the plaintiff." *Hall*, 935 F.2d at 1198. "To survive a motion to dismiss, a complaint must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is **plausible** on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pleaded facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The *Iqbal* evaluation requires two prongs of analysis. First, the court identifies "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusion, bare assertions, or merely conclusory. *Id.* at 679–81. Second, the Court considers the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* at 681. If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id.* at 679.

However, the court need not accept conclusory allegations without supporting factual averments. *Southern Disposal, Inc. v. Texas Waste*, 161 F.3d 1259, 1262 (10th Cir. 1998). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. "Nor does the complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Id.* (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (citation omitted).

### III.  DISCUSSION

The Court's analysis will proceed in two steps. First, the Court will review the portions of the Recommendation to which neither party objects in order to determine whether there are any clear errors in Judge Neureiter's findings and conclusions. Second, the Court will conduct a *de novo* review of the portions of the Recommendation to which Defendants object.

**A.  CLEAR ERROR REVIEW**

Neither party objected to Judge Neureiter's determination that Plaintiff's "claims for monetary damages against Defendants Markham and Gonzales in their official capacities are barred by the Eleventh Amendment," and those claims "should be dismissed without prejudice." (Doc. # 46 at 8–9) (citations omitted). The Court has reviewed the relevant pleadings concerning Plaintiff's claims against Defendants in their official capacities as well as the Recommendation.

Based on this review, the Court concludes that Judge Neureiter's thorough and comprehensive analyses and recommendations are correct, and "there is no clear error on the face of the record." Fed. R. Civ. P. 72 advisory committee's note. Therefore, the Court adopts the applicable portion of the Recommendation and grants the corresponding part of Defendants' Motion to Dismiss.

**B.  *DE NOVO* REVIEW**

Defendants object to Judge Neureiter's Recommendation to the extent it concludes that Plaintiff raises plausible claims against Defendants in their individual capacities under the First, Eighth, and Fourteenth Amendments. Specifically,

Defendants assert that Plaintiff's claims fail because he "failed to establish personal participation by the . . . Defendants" and, alternatively, his claims are barred by the doctrine of qualified immunity. (Doc. # 54 at 2–3.) The Court will address Defendants' personal participation argument before turning to the qualified immunity issues.

1.     Personal Participation

"Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation." *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) (quoting *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997)). Supervisory status alone does not create § 1983 liability. *Id.* (citing *Duffield v. Jackson*, 545 F.3d 1234, 1239 (10th Cir. 2008)). Rather, there must be "an affirmative link . . . between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise." *Id.* (quoting *Green v. Branson*, 108 F.3d 1296, 1302 (10th Cir. 1997)). Thus, "denial of a grievance, by itself without any connection to the violation of constitutional rights alleged by plaintiff, does not establish personal participation under § 1983." *Sherman v. Klenke*, 653 F. App'x 580, 591 (10th Cir. 2016) (quoting *Gallagher*, 587 F.3d at 1069).

Defendants assert that "the Recommendation declined to address the merits of the . . . Defendants' argument that Mr. Wilson failed to establish personal participation, instead allowing all of Mr. Wilson's claims to proceed against all of the . . . Defendants." (Doc. # 54 at 3.) The Court disagrees.

Judge Neureiter did address Defendants' personal participation argument. In fact, he explicitly rejected the argument because Defendants "fail[ed] to acknowledge

10

that Mr. Wilson makes specific allegations against each of the named Defendants."

(Doc. # 46 at 8.) Additionally, Judge Neureiter accurately noted the following:

> While in their motion Defendants specifically mention allegations made against Defendants Tolentino, Romero, and Markham (Dkt. #29 at 10–22), they seek dismissal of Mr. Wilson's First Amendment claim against all Defendants. Much like Defendants' undeveloped argument as to the personal participation of the Defendants, the Court declines to parse out the asserted deficiencies in Mr. Wilson's claims as to each individual Defendant, where Defendants did not take the time to do so. *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

(*Id.* at 11 n.2.) After reviewing the matter *de novo*, the Court agrees with Judge Neureiter's assessment. Plaintiff **does** raise specific allegations in his Complaint regarding each Defendant, and he does not merely assert that Defendants are liable because they denied his grievances. *See supra* Section I (recounting Plaintiff's factual allegations).

### 2. Qualified Immunity

The qualified-immunity doctrine protects public employees from both liability and "from the burdens of litigation" arising from their exercise of discretion. *Allstate Sweeping, LLC v. Black*, 706 F.3d 1261, 1266 (10th Cir. 2013); *see Elder v. Holloway*, 510 U.S. 510, 514 (1994) ("The central purpose of affording public officials qualified immunity from suit is to protect them 'from undue interference with their duties and from potentially disabling threats of liability.'" (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982))). When a defendant raises the qualified-immunity defense, "the onus is on the plaintiff to demonstrate '(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct.'" *Quinn*

11

*v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, (2011)).

Courts "may address the two prongs of the qualified-immunity analysis in either order," and "if the plaintiff fails to establish either prong of the two-pronged qualified-immunity standard, the defendant prevails on the defense." *Cummings v. Dean*, 913 F.3d 1227, 1239 (10th Cir. 2019) (quoting *A.M. v. Holmes*, 830 F.3d 1123, 1134–35 (10th Cir. 2016)).

### a.　First Amendment—Retaliation

"It is well-settled that prison officials may not retaliate against or harass an inmate because of the inmate's exercise of his right of access to the courts." *Requena v. Roberts*, 893 F.3d 1195, 1211 (10th Cir. 2018) (quoting *Gee v. Pacheco*, 627 F.3d 1178, 1189 (10th Cir. 2010)), *cert. denied*, 139 S. Ct. 800 (2019). Similarly, "[t]he filing of prison grievances is constitutionally protected activity." *Id.* (citing *Gee*, 627 F.3d at 1189).

> Government retaliation against a plaintiff for exercising his or her First Amendment rights may be shown by proving the following elements: **(1)** that the plaintiff was engaged in constitutionally protected activity; **(2)** that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and **(3)** that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.

*Id.* (emphasis added) (quoting *Shero v. City of Grove*, 510 F.3d 1196, 1203 (10th Cir. 2007)).

However, conduct that is merely "unprofessional and unpleasant, [does] not constitute adverse action sufficient to support a retaliation claim." *Id.* at 1211–12 (citing

*Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (insulting, disrespectful, or sarcastic comments directed at an inmate "do not, without more, constitute an adverse action" for purposes of stating a retaliation claim); *McDowell v. Jones*, 990 F.2d 433, 434 (8th Cir. 1993) ("[V]erbal threats and name calling usually are not actionable under § 1983.")) (calling inmate a "dumb Indian," harassing him "all night" while in segregation, and placing him on "nutraloaf" without following proper procedure was insufficient to support a claim for First Amendment retaliation).

In the instant case, Plaintiff's submission of prison grievances and lawsuits was constitutionally protected conduct. Additionally, Defendants' conduct caused him to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity. Specifically, Plaintiff plausibly alleges that Defendants labeled him a "rat" and passed that information to the Surenos gang, which predictably inflamed the Surenos' preexisting animosity towards Plaintiff, placed him in danger, and took a toll on his mental health. The conduct that Plaintiff describes in his Complaint is not merely unprofessional or unpleasant. Rather, it foreseeably put Plaintiff's safety at risk.

Finally, Plaintiff adequately alleges that Defendants' adverse action was substantially motivated as a response to Plaintiff's exercise of constitutionally protected conduct. *See supra* Section I. As a result, Plaintiff has stated a plausible claim that Defendants retaliated against him in violation of his First Amendment rights.

        b.        Eighth Amendment—Failure to Protect

"Under the Eighth Amendment, prison officials have a duty to 'provide humane conditions of confinement,' including 'tak[ing] reasonable measures to guarantee the

safety of . . . inmates.'" *Roberts*, 893 F.3d at 1214 (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). That duty includes "a duty to protect prisoners from violence at the hands of other prisoners." *Id.* (quoting *Farmer*, 511 U.S. at 832).

> To prevail on a failure to protect claim, an inmate must show **(1)** "that the conditions of his incarceration present an objective substantial risk of serious harm" and **(2)** "prison officials had subjective knowledge of the risk of harm," "[i]n other words, an official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."

*Id.* (emphasis added) (quoting *Howard v. Waide*, 534 F.3d 1227, 1236 (10th Cir. 2008)).

Plaintiff has plausibly alleged each element. The conditions of his incarceration present an objectively substantial risk of serious harm because Plaintiff was already a target of the Surenos gang when he arrived at Sterling, and Defendants have added fuel to the fire. The seriousness of the risk of harm Plaintiff faces from the Surenos is evidenced by the assault that formed the basis of Plaintiff's complaint in *Falk*. To reiterate, in that case, a member of the Surenos "stabbed [Plaintiff] eleven times, inflicting injuries to [his] heart, lungs, head, and neck." *Falk*, 877 F.3d at 1207.

Additionally, prison officials had subjective knowledge of the risk of harm. Plaintiff alleges that it was common knowledge that he was a target of the Surenos. The Court finds that allegation to be plausible because, as Plaintiff indicates in his Complaint, the facts that gave rise to his complaint in *Falk* were well-known among inmates and prison employees because those facts were publicized by the media and reported in a Tenth Circuit case. (Doc. # 1 at 5.) Moreover, Plaintiff indicates that Sterling employees, including Defendants Tolentino, Gonzales, and Lozano, made statements which showed that they were aware of the danger that Plaintiff faced. *See supra* Section I.

14

Further, as Judge Neureiter noted, "[t]here is no dispute" that "labeling an inmate a snitch . . . constitutes deliberate indifference to the safety of that inmate." (Doc. # 46 at 13) (quoting *Benefield v. McDowall*, 241 F.3d 1267, 1270–71 (10th Cir. 2001)) (citing *Szymanski v. Benton*, 289 F. App'x 315, 320 (10th Cir. 2008) (noting that when a prison guard labels an inmate a snitch, communicates the label to other inmates, and is aware of the "obvious danger" associated with being labelled a snitch, that guard violates "clearly established law")). Considering Defendants' knowledge of the heightened danger that Plaintiff faced from the Surenos, and the obvious danger associated with being labeled a "rat," it is plausible that Defendants knew their conduct exacerbated the risks to Plaintiff's safety. Therefore, Plaintiff has stated a claim that Defendants violated his Eighth Amendment rights.

### c.  Fourteenth Amendment—Equal Protection

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *Roberts*, 893 F.3d at 1210 (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)) (citing *Barney v. Pulsipher*, 143 F.3d 1299, 1312 (10th Cir. 1998) ("In order to assert a viable equal protection claim, plaintiffs must first make a threshold showing that they were treated differently from others who were similarly situated to them.")).

Relevant here, the Tenth Circuit has held[6] that "to establish an equal protection violation, [a prisoner] must allege facts that [a prison employee] treated him differently than other similarly situated prisoners." *Id.* "Individuals are 'similarly situated' only if they are alike 'in all relevant respects.'" *Id.* (quoting *Coal. for Equal Rights, Inc. v. Ritter*, 517 F.3d 1195, 1199 (10th Cir. 2008)). Additionally, "to state a race-based equal protection claim, '[a] plaintiff must sufficiently allege that defendants were motivated by racial animus.'" *Id.* (quoting *Phelps v. Wichita Eagle–Beacon*, 886 F.2d 1262, 1269 (10th Cir. 1989)).

With respect to Plaintiff's equal protection claim, Judge Neureiter accurately observed the following:

> Mr. Wilson alleges that he has been subject to racial slurs and is being denied access to the phone based on his race while other inmates are allowed to control the use [of] the phone. Specifically, Mr. Wilson alleges that Defendants ignore prison regulations that govern the use of the telephone (he cites to AR 850-12) and purposely cede control of the phone to certain gang members who they know will refuse to allow black inmates to use the phone. Mr. Wilson alleges he complained of this practice more than once. The Court finds that Mr. Wilson's allegation that Defendants failed to follow prison regulations, knowing that their actions would result in

---

[6] *Roberts* forecloses Defendants' argument that the law in this context is not clearly established. In that case, a prisoner raised an equal protection claim in which he asserted that prison employees were restricting usage of the phone based on prisoners' race. *Roberts*, 893 F.3d at 1210. The court found that the plaintiff failed to state a claim because he did not show that similarly situated prisoners were treated differently. *Id.* Although the court did not explicitly address the question of whether the law was clearly established, it is evident that, if the plaintiff had shown that similarly situated prisoners were treated differently, limiting access to the telephone based on a prisoner's race would have been a cognizable equal protection claim. *See Ullery v. Bradley*, 949 F.3d 1282, 1291 (10th Cir. 2020) ("Though 'a case directly on point' is not required, 'existing precedent must have placed the constitutional question regarding the illegality of the defendant's conduct beyond debate.'" (citation omitted)). In any event, restricting access to programs or supplies based on a person's race is "so egregious even a general precedent applies with 'obvious clarity,'" such that "the right can be clearly established notwithstanding the absence of binding authority involving materially similar facts." *Id.* at 1291–92 (quoting *Lowe v. Raemisch*, 864 F.3d 1205, 1210 (10th Cir. 2017)).

black inmates not having access to the phone, is sufficient to state a Fourteenth Amendment equal protection claim.

(Doc. # 46 at 14.) In addition, Plaintiff alleges that Defendants allow Hispanic Surenos to utilize the phone **even when** Surenos have lost their privileges due to conduct violations, but Defendants do not grant telephone access to black inmates **even if** those inmates have not lost their privileges. (Doc. # 1 at 7.) Based on these allegations, the Court agrees with Judge Neureiter that Plaintiff has stated an equal protection claim.

## IV.   CONCLUSION

Based on the foregoing, the Court ORDERS as follows:

- Judge Neureiter's Recommendation (Doc. # 46) is AFFIRMED AND ADOPTED as an order of this Court;

- Defendants Tolentino, Bierend, Perdue, Markham, Lewis, Romero, and Gonzales's Motion to Dismiss (Doc. # 29) is GRANTED IN PART AND DENIED IN PART. The Motion is **granted** as to Plaintiff's claims for monetary damages against Defendants Markham and Gonzales in their official capacities. Those claims are dismissed without prejudice. The Motion is **denied** as to Plaintiff's claims against Defendants in their individual capacities—i.e., Plaintiff's claims arising under the First, Eighth, and Fourteenth Amendments. Those claims remain pending.

DATED: September 17, 2020          BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge

17